Argued and submitted April 13, affirmed September 28, 1983

In the Matter of the Compensation of
Clarice Banks, Claimant.

UNITED PACIFIC RELIANCE
INSURANCE COMPANY,
*Petitioner,*

*v.*

BANKS et al,
*Respondents.*

(79-08983 & 79-09538; CA A25014)

669 P2d 831

Jerald P. Keene, Portland, argued the cause for petitioner. With him on the brief was Wolf, Griffith, Bittner, Abbott & Roberts, Portland.

Noreen K. Saltveit, Portland, argued the cause for respondent Clarice J. Banks. With her on the brief was Law Offices of Noreen K. Saltveit and Associates, Portland.

Mildred J. Carmack, Portland, argued the cause for respondent Argonaut Insurance Company. With her on the brief was Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

The question in this workers' compensation case is which of two successive carriers is responsible. Claimant, a sandwich maker for Papa John's Sandwich Company, began to experience symptoms of her shoulder condition January 8, 1979, while United Pacific Reliance (U.P.) was the carrier. However, claimant did not seek medical attention or miss work until May, 1979, when Argonaut Insurance Company (Argonaut) was the carrier. Argonaut contends that claimant's condition is an injury for which U.P. is responsible; U.P. contends that it is a disease for which Argonaut is responsible, or alternatively that, if it is an injury, Argonaut is nevertheless responsible because claimant's employment while Argonaut was the carrier contributed independently to her injury.

The referee found that Argonaut was the responsible carrier. He concluded that, whether claimant suffered from an injury or an occupational disease, her employment while Argonaut was the carrier had contributed to her condition, also noting that she was not disabled until after Argonaut became the carrier. The Workers' Compensation Board reversed, finding that claimant suffered an injury while U.P. was the carrier and that her employment while Argonaut was the carrier did not alter U.P.'s liability. On *de novo* review, ORS 656.298(6), we conclude that claimant suffered an injury and that U.P., the carrier at the time of the injury, is responsible.

Claimant's trouble began on the day she returned to the production line after a period of three or four weeks replacing a vacationing worker at a desk job. That day was one of the particularly strenuous days, known as "triangle days," when "triangle sandwiches" were produced. As the referee described claimant's work:

> "* * * Claimant's job was standing at the counter approximately waist high with stacks of bread on breadboards to her left, mustard and mayonnaise in large bowls to her right, meat, cheese and other ingredients in front of her. She would pick two pieces of bread at a time, lay them down in rows in front of her with the left hand, apply mayonnaise or mustard and then fill the sandwiches with meat and cheese as necessary. This was a fast twisting side-to-side motion with her arms and hands working very quickly. Occasionally claimant had to stoop or bend to fetch a new breadboard full of bread from

underneath her counter and put it on top of her counter to her left. Occasionally she would have to stoop to her right to fill the mustard and mayonnaise bowls from vats."

The work was very fast and involved particularly awkward movements. The boards she was required to lift were heavy. Claimant testified that she felt a sudden sharp pain in her left shoulder, which she described as feeling like

> "* * * somebody was turning on something, off and on, like a switch or something, a shock or something like that * * *."

She believed she had been bending at the time and at that moment thought she must have "moved wrong," although she could remember no single specific movement to which she attributed the onset of the pain. At an earlier hearing[1] she had testified:

> "* * * I was just hurrying and involved in doing my work, and I lifted. All of a sudden I got this pain in my shoulder, and I said must have moved wrong or something. I said to Becky, 'I must have moved wrong or something.' She said, 'Oh, is it really bothering you?' I said 'Yes, it is really bothering me, but I guess it will go away.' * * *"

At that hearing, in response to her attorney's question as to whether there was one specific incident when she felt pain in her arm, she responded, "Yes, when I went to go like this (indicating) to make my normal way to make my sandwiches." Before that incident, claimant had not had any problems with her shoulder.

Claimant continued to experience pain in her left shoulder area after the January 8 incident, but did not immediately seek medical attention or miss work. She did, however, frequently perform lighter work or ask her co-worker to help with the tasks that caused her pain. Supervisory personnel and a co-worker recalled her complaints. She testified that at first her shoulder only bothered her on "triangle days," but eventually it bothered her on other days as well. At the end of April or beginning of May she went to the emergency room at Holladay Park Hospital, where she was told she had a "charley

---

[1] On December 7, 1979, a hearing was conducted to determine whether Argonaut had wrongfully terminated the claim in October, 1979.

horse."[2] On May 7, 1979, claimant first saw her initial treating physician, Dr. Berselli, an orthopedic surgeon, who prescribed medication and physical therapy and advised her to stop working. His initial diagnosis was "chronic mild fascitis of the rhomboid muscle group." She was referred to Dr. Langston in September, 1979. He diagnosed "musculoligamentous strain of the left supraspinatus and overlying trapezius area, by history," and could not find "objective evidence of disability." An artherogram by a radiologist revealed no underlying rotator cuff tear. In November, 1979, Dr. Berselli stated that he could find no specific organic reason for claimant's pain. That December she consulted Dr. Thompson, an orthopedic surgeon. He thought she might have a herniated cervical disc and referred her to Dr. Berkeley, who performed a myelogram in February, 1980. He found a "discrete C5-C6 lesion causing bilateral nerve root amputation," confirming his diagnosis of "traumatic cervical spondylopathy at C5-6." He recommended surgery. Dr. Berkeley concluded that claimant's condition was the direct result of her January 8, 1979, injury, an opinion in which Dr. Berselli concurred.

The first inquiry is whether claimant's condition resulted from an industrial injury or an occupational disease. In *O'Neal v. Sisters of Providence,* 22 Or App 9, 537 P2d 580 (1975), we approved the following language to define the distinction:

> " '* * * What set[s] occupational diseases apart from accidental injuries [is] both the fact that they can[not] honestly be said to be unexpected, since they [are] recognized as an inherent hazard of continued exposure to conditions of the particular employment, and the fact that they [are] gradual rather than sudden in onset. * * *' (Quoting from 1A Larson Workmen's Compensation Law § 41.31 (1973))." 22 Or App at 16.

> " '* * * An occupational disease is stealthy and steals upon its victim when he is unaware of its presence and approach. Accordingly, he can not later tell the day, month or possibly even the year when the insidious disease made its intrusion into his body. * * * Upon the other hand, the victim of an industrial accident virtually always can tell the day and even the hour when the purported injury befell him. He does not attribute his present condition to something that crept in

---

[2] n illegible report from Holladay Park Hospital in the record appears to be dated May 7, 1979.

upon him unobserved but to an accident which he and possibly [many] [sic] others observed. * * *' *White v. State Ind. Acc. Com.,* 227 Or 306, 322, 362 P2d 302 (1961)." 22 Or App at 14.

█     Applying these distinctions in this case, we find the description of the onset of claimant's condition to be more consistent with an injury. It was sudden and occurred on claimant's first day back on the line on a particularly strenuous day. Although she said that she could not connect the pain with a particular movement, she also stated that she thought she was bending when she felt the pain and at the previous hearing even indicated the motion she had made.[3] She had had no previous shoulder problem. Although it is not unexpected that the kind of work claimant performed could result in such a shoulder condition, *see O'Neal v. Sisters of Providence, supra,* it is less to be expected that a *disease* condition caused by claimant's sandwich making work would manifest itself after a period of sedentary office work.

█     The determination that claimant's condition originally resulted from an injury is not dispositive. We must also consider the effect on her condition of her continued work. Because it is the result of an injury, claimant's disability is governed by the "last injury rule" enunciated in *Smith v. Ed's Pancake House,* 27 Or App 361, 556 P2d 158 (1976), and clarified in *Boise Cascade Corp. v. Starbuck,* 61 Or App 631, 659 P2d 424, *rev allowed* 294 Or 792 (1983). In cases involving successive injuries and successive insurance carriers, we stated in *Smith* that the rule set forth in 4 Larson, Workmen's Compensation Law 17-72—17-78, § 95.12 (1976),[4] applies:

" *'If the second injury takes the form merely of a recurrence of the first, and if the second incident does not contribute even slightly to the causation of the disabling condition, the insurer on the risk at the time of the original injury remains liable for the second.* In this class would fall most of the cases discussed in the section on range of consequences in

---

[3] In support of its argument that claimant's disability did not result from an injury, U.P. points to portions of the record in which claimant described the onset of her pain as "gradual." We agree with the Board's conclusion that

"* * * the references in the record to the gradual *onset* of pain are best interpreted to mean claimant's symptoms gradually increased in degree between January 8, 1979 and May 8, 1979, when claimant was advised by her physician to cease her work activity." (Emphasis the Board's.)

[4] The same language appears in the 1983 edition.

which a second injury occurred as the direct result of the first, as when claimant falls because of crutches which his first injury requires him to use. *This group also includes the kind of case in which a man has suffered a back strain, followed by a period of work with continuing symptoms indicating that the original condition persists, and culminating in a second period of disability precipitated by some lift or exertion.*

" 'On the other hand, if the second incident contributes independently to the injury, the second insurer is solely liable, even if the injury would have been much less severe in the absence of the prior condition, and even if the prior injury contributed the major part to the final condition. This is consistent with the general principle of the compensability of the aggravation of a pre-existing condition.' " 27 Or App at 365. (Emphasis supplied.)

Thus, "if the original disability was the result of an injury, liability is not imposed on the last employer unless a new incident contributed independently to the injury." *Fireman's Fund Ins. Co. v. Ore. Ptld Cement Co.,* 63 Or App 63, 66, 663 P2d 416 (1983).

■ We conclude, after reviewing the evidence, that while Argonaut was the carrier claimant suffered no subsequent injury contributing to the causation of her disability. Dr. Berkeley wrote to Argonaut's counsel that claimant's condition was the direct result of the January, 1979, injury. However, it is not clear to what question he was responding and whether he was ruling out subsequent contributing causation. The primary medical evidence is from Dr. Berselli, claimant's original treating physician, which, taken as a whole, indicates that claimant's subsequent work did not contribute to her injury.[5] At most, Dr. Berselli's testimony indicates the possibility that claimant felt pain from her original injury when she engaged in continued activity at work. With the possible exception of the visit to the hospital emergency room, there is

---

[5] In April, 1980, he wrote U.P. that "it is medically probable that the claimant's continual work activity did indeed contribute to her need for medical care and treatment." In June, 1980, he wrote Argonaut's counsel that he concurred with Dr. Berkeley's evaluation. The same month, Dr. Berselli was deposed. In answer to a question whether claimant's work would have caused an aggravation of her underlying condition, Dr. Berselli replied:

"* * * I just can't say if it made her underlying condition worse or not. It undoubtedly caused her more pain, but whether or not it worsened the underlying pathologic changes going on, I just don't know."

no evidence of an identifiable subsequent incident. The evidence describes a situation similar to the example of the person with back strain described by Larson and quoted in *Smith v. Ed's Pancake House, supra. Compare Buchanan v. Owen Chevrolet,* 44 Or App 31, 604 P2d 1277 (1980), *with Clayton's Automotive v. Stayton Auto Supply,* 54 Or App 980, 636 P2d 1020 (1981), *rev den* 292 Or 581 (1982). Claimant experienced continuing symptoms at work and increasing pain, but no new incident contributed to the causation of her injury. Thus Argonaut is not responsible for her claim by virtue of a subsequent injury.

U.P. argues that, because claimant did not miss work or seek medical treatment while U.P. was the carrier, it should not be responsible. The referee stated that "compensation payments are not for the injury. They are for disablement." We agree with the Board that the insurer covering the risk at the time of the injury bears responsibility for that injury, even if resulting disability develops later. That is the arrangement contemplated by the compensation statutes. *See, e.g.,* ORS 656.005(19), ORS 656.202(2).[6]

Affirmed.

---

[6] ORS 656.005(19) provides:

" 'Party' means a claimant for compensation, the employer of the injured worker *at the time of injury* and the insurer, if any, of such employer." (Emphasis supplied.)

ORS 656.202(2) provides:

"Except as otherwise provided by law, payment of benefits for injuries or deaths under ORS 656.001 to 656.794 shall be continued as authorized, and in the amounts provided for, by the law in force *at the time the injury giving rise to the right to compensation occurred.*" (Emphasis supplied.)